Filed 10/22/24 In re K.S. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION EIGHT

| | |
|---|---|
| In re K.S., a Person Coming Under the Juvenile Court Law. | B334934 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. MATTHEW S. et al., Defendants and Appellants. | (Los Angeles County Super. Ct. No. 21LJJP00332A) |

APPEAL from orders of the Superior Court of Los Angeles County, Jennifer W. Baronoff, Juvenile Court Referee. Affirmed.

Brian Bitker, under appointment by the Court of Appeal, for Defendant and Appellant Matthew S.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant J.G.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Deputy County Counsel for Plaintiff and Respondent.

————————————

Matthew S. (Father) and J.G. (Mother), the parents of K.S., appeal from the juvenile court's orders denying Mother's Welfare and Institutions Code[1] section 388 petition and terminating their parental rights pursuant to section 366.26.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

I.     Events Leading up to Juvenile Court Jurisdiction

K.S. came to the attention of child welfare agencies in San Diego County four times in 2018 and 2019 due to allegations of her parents' substance abuse, inability to care for her, and domestic violence.  Except for one report of domestic violence that was referred to the District Attorney, each referral was closed as inconclusive when social workers could not locate the family or were denied entry into the home.

In June 2021, a camping ground attendant reported finding then seven-year-old K.S. alone, scared and crying.  Law enforcement officers called to perform a child welfare check found K.S. next to her passed-out mother on the bed of a recreational vehicle (RV).  The RV smelled of smoke, urine, and dog feces.  Drug paraphernalia with visible residue was in the kitchen.  There was no edible food in the RV, and K.S. reported her stomach hurt from hunger.

Mother awakened when the officers shook the bed.  She appeared to be under the influence of a controlled substance and later admitted using heroin that day.  Mother said she and Father used drugs daily: she used methamphetamine, heroin, and marijuana, while Father used methamphetamine and

---

[1]     All statutory references are to the Welfare and Institutions Code.

2

possibly heroin.  K.S. observed her parents smoke unknown substances daily and described their drug use practices in detail.

Mother reported domestic violence by Father.  K.S. said her parents did not get along and fought over food and drugs; she had seen Father kick Mother.  K.S. said she felt safe with Mother but feared Father.  He came and went as he pleased, and he did not buy food.  Father did not permit K.S. to attend school; she was teaching herself to read but could not write.

Father denied living with Mother and K.S.  He denied engaging in domestic violence, accused Mother of physical abuse, and said she was mentally ill.  He denied knowing Mother was currently using drugs and denied ever using drugs, although he later said he had used cocaine and methamphetamine but was not an addict.

Mother was arrested for child endangerment and drug offenses, and later pleaded guilty to misdemeanor child endangerment (Pen. Code, § 273a, subd. (b)).  K.S. was detained from her parents and placed with caregiver A.H.  On June 24, 2021, the Department of Children and Family Services (DCFS) filed a petition alleging K.S. was subject to the jurisdiction of the juvenile court pursuant to section 300, subdivisions (a) and (b)(1), due to domestic violence, parental incapacity due to drug use, and hazardous conditions in the home.

At the jurisdictional and dispositional hearing in September 2021, the court found true as amended all allegations under section 300, subdivision (b)(1).  The court declared K.S. a dependent child, removed her from her parents' custody, and ordered her suitably placed.  The court ordered reunification services for both parents, including a domestic violence program, parenting education, individual and conjoint counseling, and

drug testing, with a full rehabilitation program, aftercare, and 12-step program required in the event of a positive test.

II.     First Reunification Period

K.S. positively adjusted to living in the home with A.H., and she was comfortable sharing her feelings with A.H.  K.S.'s therapist noted A.H. was "a great support" for K.S. and provided useful information to assist in therapy.  A.H. was attending to K.S.'s medical, dental, educational, and emotional needs: she had received well-child exams and dental exams, attended school daily, and had therapy weekly.  K.S. was reported to be "very happy, open in her conversation, and cooperative with services."  K.S. told the social worker that she wanted to be adopted, but then said she did not want to be adopted, she wanted to remain with A.H. " 'just for forever.' "  A.H. expressed interest in adopting K.S. or becoming her legal guardian.

As of October 2021, although K.S. wanted to visit her parents, there were no in-person visits because neither parent had maintained contact with DCFS or committed to a visitation schedule.  The parents' phone calls were inconsistent, and they went weeks at a time without speaking with K.S.

In March 2022, DCFS described the parents' contact with K.S. as "minimal," and Mother said she had not spoken with K.S. in three months.  Once in-person visits began, Mother failed to appear for a visit with K.S. on April 19, 2022.  She was late for her April 23, 2022 visit and then spent 25 minutes in the restroom.

In May 2022, DCFS informed the court that K.S.'s behavior had changed since she resumed visits with her parents.  K.S., the social worker wrote, "appears unhappy, and not her usual bubbly self, and she appears overly forgetful and at times disrespectful

4

with the caregiver. The caregiver reports she doesn't want to engage in therapy unless[] the caregiver is present, and K[.S.] has been ignoring the teacher at school when asked to read or complete assignments."

During this reunification period, DCFS reached out to both parents regularly by email, text, and phone, but they rarely responded; and when they did, they made excuses or blamed others, ignored information that had been provided to them, failed to provide requested information, and regularly failed to follow through with things they agreed to do. Although both parents stated an intent to participate in services, neither complied with the case plan. Mother told DCFS she was unable to participate in programs "due to being confined to her home and another individual not allowing her to have contact with the Department or Court." In early March 2022, DCFS reported, "Throughout the life of the case, [M]other had made numerous claims that she was on a waitlist for a treatment program in North Hollywood. In February 2022, [M]other reported being enrolled in treatment at CRI-Help in North Hollywood," but on February 28, 2022, she reported no longer being in treatment there. DCFS received no response from the program about Mother's enrollment or any services she received.

On March 17, 2022, Mother told DCFS she had gone to rehabilitation and wanted drug testing information. The social worker asked Mother for documentation of her treatment. On April 11, 2022, Mother reported she went to the CRI-Help Detox Program but never received any paperwork. On May 9, 2022, Mother told DCFS she was trying to get into rehabilitation. Mother failed to appear for drug testing on April 22, 2022, May 16, 2022, and May 31, 2022.

5

In May 2022, Mother advised DCFS of her enrollment in a parenting class and submitted a confirming letter from the provider. DCFS later learned from the program provider that Mother had been disenrolled because she had not attended any classes. Mother's enrollment letter had been sent in error, and she had been instructed to disregard the enrollment letter.

At the section 366.21, subdivision (e) review hearing on June 3, 2022, the court found the parents not in compliance with their case plans but continued reunification services over DCFS's objection.

III.    Second Reunification Period

DCFS advised the court in August 2022 that K.S. was "bright, happy, [and] caring." She was well cared for in A.H.'s home. K.S. could "articulate her needs, wants, as well as her disappointments, and appear[ed] to be very mature in thought at such a young age." However, she tended to "shut[] down or respond[] rudely when she d[id]n't want to talk, clean her room, and when she remember[ed] things when she resided with her parents." As K.S. had done whatever she wanted when she lived with her parents, sometimes she had difficulty with the rules in A.H.'s home, like keeping her room clean and her clothes off the floor.

A.H. and K.S. appeared to DCFS to have a close bond, and A.H. described K.S. as "a joy" to have. In August 2022 K.S. told the social worker she liked living with A.H. and wanted to stay with her until she returned to her parents. When told returning to her parents might be a problem because they had not taken the classes they were asked to take, K.S. said, " 'They need to get it together.' "

6

Mother and Father confirmed visits, but often arrived late, canceled at the last minute, or simply did not show up. K.S. was disappointed, but she made "excuses for the parents not showing up or arriving late, not understanding that it is her parent[s'] responsibility as adults to show up at their visits timely, and attend the visits." At two visits, Mother made K.S. cry by telling K.S. she would not see her if Mother went to rehabilitation. DCFS wrote, "The conversations she had with K[.S.] were not something a 9 year old should be responsible for hearing."

Mother and Father did not comply with the case plan. Mother failed to appear for drug testing on June 17 and 27, 2022, July 7 and 18, 2022, and August 10, 2022. In August 2022, Mother was observed to have scabs on her skin, she spoke quickly, and she acted jittery, leading the social worker to note it was "apparent that she does have a substance abuse issue."

At the section 366.21, subdivision (f) review hearing on October 17, 2022, the court terminated the parents' reunification services and set a section 366.26 permanency planning hearing.

IV.    After the Termination of Reunification Services

In January 2023, K.S. and A.H. were reported to be well bonded. A.H. loved K.S. and was committed to adopting her. K.S. said she was happy and wanted to stay with A.H. forever. When the different permanency plan options were explained to K.S., she said she wanted A.H. to be her mom. K.S. seemed to find comfort in hugging A.H. during the discussion about permanency. A.H. not only met K.S.'s medical, dental, emotional, educational, and mental health needs, she took "initiative in always searching for extra resources to help" K.S.

7

Between October 18, 2022 and February 14, 2023, neither parent visited with K.S., drug tested for DCFS, or contacted DCFS. Once K.S. stopped seeing her parents she stopped being rude, disrespectful, and unwilling to complete tasks.

On February 17, 2023, Mother had a monitored telephone call with K.S. K.S. was surprised to hear from Mother. For a few months, Mother and Father visited with K.S. with some regularity. Mother behaved appropriately at visits between late February and April 2023, and K.S. was happy to see her. DCFS described the visits as "of high quality based on the parents following rules on a consistent basis and interacting with the minor in a positive manner."

However, on March 3, 2023, K.S. had a fight at school, and she, the social worker and a school administrator spoke to the parents. While Mother did attempt to address K.S.'s behavior, she giggled through the entire conversation, spoke rapidly, and told K.S. she " 'can't be acting like a little bitch.' " Mother also did not remember that she had an upcoming visit with K.S. When the call ended, the social worker noticed K.S. appeared about to cry and asked if this was because of the fight. K.S. said she was not upset because of the fight, but stopped short when she started to explain what had upset her. A.H. told the social worker that now that K.S. was seeing and speaking with her parents again, her behavior had worsened. A.H. said that the visits confused K.S. and made her think she was going to return to her parents.

Mother canceled one visit in April 2023 and was incarcerated in May 2023. K.S. was sometimes angry and acted out after parental visits or when her parents failed to contact her for extended periods of time.

Matters deteriorated in June 2023. Mother had to be instructed not to discuss case issues with K.S. during a June 2, 2023 call. Mother and Father were in an altercation during Mother's June 10, 2023 call: "Mother stated that she had to get away and sounded like she was running or walking fast," and Father yelled at Mother during the call. The social worker had to redirect mother from discussing case issues with K.S. After the call K.S. cried, and A.H. told DCFS K.S.'s parents were causing her emotional turmoil.

Both parents were scheduled for a June 14, 2023 visit, but only Father appeared. Neither parent showed up for the June 20 and June 29, 2023 visits. On June 20, K.S. became distraught and extremely agitated that her parents did not show up. On June 29, K.S. "was not surprised that her parents did not come to the visit, but she was upset." K.S. worried because Mother had not been visiting or responding to texts or calls.

In the first six months of 2023, Mother visited K.S. eight times. In July 2023, DCFS reported, "The recent visits have been emotionally difficult for K[.S.]. Her caregiver reports that she is often angry after the visits or phone calls, and that she has 'an attitude.' K[.S.] becomes emotional and moody when her parents do not show up for the visits, which is a regular occurrence." K.S. wanted in-person visits with her parents, but she often expressed doubt that they would appear. She was very distressed by telephone calls with her parents and no longer wanted to speak with them over the telephone.

Mother visited K.S. two or three times during the week before a July 2023 court date, and then did not visit her again until October 2023. K.S. stopped asking about visiting her parents, did not say she missed them, and declined a visit from

9

her parents on her birthday. During the parents' October 3, 2023 visit, K.S. twice said she was bored, and once said she wanted to go home, meaning A.H.'s home. Mother visited K.S. twice more in October 2023. DCFS advised the court in late October 2023 that during visits, "there does not appear to be much of a strong attachment, bond, engagement, [or] interaction[,] and K[.S] is oftentimes ready to go early."

On November 15, 2023, Mother told DCFS she would be unable to visit K.S. because she was checking into a treatment program. The following day, Mother told K.S. over the phone that she was going to get help, so she would not see K.S. for a while. Mother had a video visit with K.S. on November 30, 2023. She enrolled in an inpatient treatment program on December 12, 2023.

V.     Section 388 Petition and Termination of Parental Rights

The permanency planning hearing was scheduled for December 21, 2023. On that date, although the remainder of the hearing was continued, the court elected to have K.S. testify because she was present in court.

K.S. testified she could not recall the last time she visited with Mother, it was "such a long time ago." K.S. liked parental visits, and she felt sad when they did not show up for visits, both because she looked forward to seeing them and because she would not have to do homework. What she missed about Mother was laughing with her. She laughed differently with her parents than with other people. K.S. loved Mother and thought about her at night, but she also thought about Father and "a lot of stuff."

K.S. testified that for her 10th birthday, in October 2023, she celebrated by bringing cookies to her classmates, and then she and A.H. ate and drove around town in search of a "Barbie

10

shake." When they learned the Barbie shake was not real, they went home and watched the Barbie movie together. K.S. did not see her parents on her birthday. When asked how she would like to spend her 11th birthday, K.S. said she would want to spend it the same way as her 10th. Ahead a few years, K.S. testified she wanted to celebrate her 16th birthday by going to a professional football game with A.H.

K.S. testified that when she had a good day at school, she told her daycare providers and A.H. about it; and when she had a bad day, she discussed it with A.H. and her therapist. K.S. loved A.H. and did not want to leave her. In a perfect world, she would like to have both her parents and A.H. in her life. K.S. refused to answer whether she wanted to be adopted, explaining she "d[id not] want to say it" because she did not want to hurt Father's feelings.

On January 29, 2024, Mother filed a section 388 petition requesting that K.S. be returned to her custody, or, in the alternative, reinstatement of reunification services, due to the changed circumstance that she had begun an inpatient treatment program. Mother asserted this change would be in K.S.'s best interest because K.S. loved her mother and they were bonded, and she could be in Mother's care while maintaining a relationship with A.H.

At the combined section 388 and permanency planning hearing on February 2, 2024, Mother presented a letter from her substance abuse treatment program stating that she had enrolled in the program on December 12, 2023. She was still in the orientation phase of the program and was reported to "struggle with following [the] program guidelines." Mother was actively participating in her program, attending multiple groups, seeing a

therapist weekly, and attending 12-step activities.  According to her counselor, Mother was "working to remain in consistent contact with her Narcotics Anonymous Sponsor."  It was expected she would advance to the next phase of the program on February 4, 2024, and also that she "will begin working towards the completion of Step 1 of the 12 Steps."  Mother also submitted documentation that she attended various 12-step program activities and results from three drug tests indicating that she had tested positive for multiple substances at her time of enrollment but had since tested negative twice; and she had tested negative for alcohol all three times.

Mother testified at the hearing that her treatment program had changed her life.  She said, "I have learned how serious the disease of addiction can be and how traumatizing it can be for— for myself as well as for my daughter.  I've learned lots of ways to cope with, you know, dealing with stressors or triggers or anything that could, you know, have an effect on me possibly relapsing.  I have learned a lot through parenting.  I have actually started reading a lot of parenting books as well."  When asked what those stressors or triggers were, she responded, "[W]ell, obviously, people, places, and things, definitely, which has been illuminated entirely since I'm now here; being in unhealthy relationships with people from my past, just—you know, just being in the wrong environments."  Mother testified she previously did not believe in herself due to her poor decision-making skills, lack of stability, guilt, shame, and people who discouraged her.  Now she believed in herself and had "amazing support that tell me that I am actually worthy and that, you know, I have a chance to be able to figure out what I'm doing and get my daughter back."

Mother was "still on step one" of her 12-step program and was about to receive a sponsor pass so she and her sponsor could "thoroughly go through step one." Mother's drug of choice was fentanyl, which she had last taken in November 2023. She also used methamphetamine and marijuana, and last used methamphetamine right before checking into her treatment program in December 2023.

When asked what had prevented her from joining a treatment program in the past, Mother said she "had joined a few, honestly," but she never followed through with them because she "never really had anyone to encourage [her] to go and to actually stay and follow through with it," and because she lived in a remote area and lacked transportation. When she was "struggling in treatment centers," Father "never really encouraged [her] to stay," and he did not provide transportation for her. Mother had completed a detox program with CRI-Help; she "tried to stay there and that . . . really didn't work out."

Although in her petition Mother had requested K.S. be returned to her custody, at the hearing on the petition Mother requested only reinstatement of reunification services. Mother's counsel argued that her entry into an inpatient treatment constituted changed circumstances. DCFS and K.S.'s counsel argued against Mother's section 388 petition and urged the court to terminate parental rights.

The court denied Mother's section 388 petition. It commended Mother for entering a substance abuse program, but it did not find that to be a change in circumstances because Mother had last used drugs in November and was still on step one of her 12 step program. Even if the court were to consider Mother's start of a treatment program to be a change in

13

circumstances, it did not believe reinstatement of reunification services was in K.S.'s best interest.  The court emphasized the three-year length of the dependency case and K.S.'s entitlement to permanency.

Proceeding to the permanency planning hearing, the court rejected the parents' argument that the beneficial parental relationship exception to termination of parental rights applied. The court questioned whether the parents' visitation could be considered consistent, and concluded that even if it were, neither parent had established the type of bond with K.S. that would outweigh the permanency and stability that came with adoption. The court terminated parental rights.  Both parents appeal.

## DISCUSSION

Mother, joined by Father,[2] argues the juvenile court abused its discretion by denying her section 388 petition, and that this error requires vacating the order terminating parental rights.

Section 388 provides for modification of juvenile court orders when the moving party (1) presents new evidence or a change of circumstance and (2) demonstrates modification of the previous order is in the child's best interest.  (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415; *In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1194.)

When, as here, a section 388 petition is filed after family reunification services have been terminated, the juvenile court's overriding concern is the child's best interest.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)  The parent's interests in the care, custody and companionship of the child are no longer paramount;

_____

[2]     Father asserts no independent claims of error, simply joining Mother's arguments.

14

and the focus shifts to the needs of the child for permanency and stability.  (*Ibid*.; *In re Malick T.* (2022) 73 Cal.App.5th 1109, 1123.)  Nonetheless, a parent may rebut the presumption that once family reunification services have been terminated, reunification is not in the child's best interest, by showing that circumstances have changed and the best interest of the child warrants further reunification services.  (*Stephanie M.,* at p. 317, *Malick T.* at p. 1123.)  "[A]fter reunification services have terminated, a parent's petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability."  (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

We review the court's decision to grant or deny a section 388 petition based on its best interest finding for abuse of discretion and may disturb the exercise of that discretion only in the rare case when the court has made an arbitrary or irrational determination.  (*In re Matthew M.*, *supra*, 88 Cal.App.5th at pp. 1194–1195.)  We do not inquire whether substantial evidence supports the order, nor do we reweigh the evidence and substitute our judgment for that of the juvenile court.  (*Id.* at p. 1195.)

Assuming, without deciding, that Mother demonstrated a change in circumstances, the juvenile court did not abuse its discretion in determining reinstated reunification services would not be in K.S.'s best interest.  For two and one-half years after she was removed from Mother and Father, K.S. had been in a safe, caring, stable home with a caregiver who not only met her physical, medical, educational, and emotional needs but also provided outstanding support and made consistent, dedicated efforts to help her.  K.S. and A.H. were bonded: K.S. loved A.H.

15

and looked to her for emotional support in good times and bad; and it was with A.H., not her parents, that she wanted to spend special days like her birthday. K.S. wanted to remain with A.H. "forever" and asked A.H. to adopt her. K.S. loved her parents, but when Mother and Father intermittently reappeared in her life, the ensuing lack of certainty about her future confused K.S. and caused her to suffer and to act out, demonstrating the urgency of ending her long wait for permanency.

On the other hand, Mother had been in treatment for seven weeks, was still in the orientation phase, was struggling to follow the rules, and was on step one of the 12 steps. Given that she had barely begun treatment for her serious substance abuse problem, it was not irrational or arbitrary for the juvenile court to conclude it would not serve K.S.'s interest in permanency and stability to delay that permanency and upend her stability for the speculative benefits offered by further reunification services.

Relying on her seven years of raising K.S. before K.S.'s removal, the maintenance of their relationship through visitation, the high quality of her visits, as well as K.S.'s love for Mother, desire to see her, and pain when Mother stopped visiting, Mother argues further reunification services would in fact advance K.S.'s need for permanency and stability. This breathtakingly rosy assessment of the record does not demonstrate that the juvenile court exceeded the bounds of reason (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319) when it determined that neither the last-minute change in circumstances nor the possible eventual benefit offered by further reunification services warranted the disruption of K.S.'s stability and the postponement of permanency that reinstated services would cause. When two or more inferences can reasonably be

deduced from the facts, the reviewing court has no authority to substitute its decision for that of the juvenile court.  (*Id.* at p. 319.)  The court did not abuse its discretion by denying Mother's section 388 petition.

## DISPOSITION

The orders denying Mother's section 388 petition and terminating parental rights are affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



STRATTON, P. J.

We concur:



GRIMES, J.



VIRAMONTES, J.